UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| UNIVERSAL COIN AND BULLION, LTD., | |
| Plaintiff, | Case No. 2:12-cv-02778-(SMH-dkv) |
| v. | |
| FEDERAL EXPRESS CORPORATION, PRC, LLC, TPUSA, INC. AND RANDSTAD:SPHERION STAFFING, LLC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff Universal Coin and Bullion, Ltd. ("UCB" or "Plaintiff"), by its undersigned attorneys, brings this action against Defendants Federal Express Corporation ("Federal Express"), PRC, LLC (f/k/a Precision Response Corporation) ("PRC"), TPUSA, Inc. ("TPUSA") and Randstad:Spherion Staffing, LLC ("Spherion") or collectively ("Defendants") for wrongful disclosure of confidential business transaction information to unauthorized recipients. Plaintiff's allegations as to itself and its own actions are based upon its personal knowledge and on information obtained during the course of its attorneys' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.      Defendants by and through their contractors and or their employees disclosed confidential information of UCB including their account invoices without authorization and in a manner inconsistent with Defendants' own policies and procedures.  Defendants failed to use reasonable care in ascertaining the identity of contacts by unauthorized non-UCB personnel before disclosing confidential UCB information to third party New York coin dealers.

2.      The third party New York coin dealers using information derived from Plaintiff's account invoices wrongfully disclosed by Defendants stole customers and sales from UCB and devised and executed a scheme to defraud coin purchasers including Plaintiff's clients by means of materially false and fraudulent pretenses, representations and promises involving the offer and sale of coins.  As a result of these offers and sales, Plaintiff's clients have been financially unable and/or unwilling to conduct further business with Plaintiff.

3.      Plaintiffs do not complain of the transportation, delivery or pick up of any package or shipment, but rather Defendants' post-delivery failure to maintain the confidentiality of Plaintiff's account information including but not limited to account invoices and client shipping history.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the plaintiffs are citizens of different states than the defendants, and the amount in controversy exceeds $75,000 exclusive of costs.

5.      Venue is properly with this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to UCB's claims have occurred within this District; Defendants transacted business within this District and Federal Express' principal place of business is in this District.

6.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the internet and phone lines.

## PARTIES

7.      Plaintiff Universal Coin and Bullion, Ltd. is a business specializing in the marketing, sale and distribution of precious metals including but not limited to gold coins.  UCB

was formed in 1994 and has established a successful business model in Beaumont, Texas of selling coins of all types to the general public and coin dealers within the United States of America.  UCB has established itself as one of the leading coin dealers in the country and is a Better Business accredited company with an A+ rating.  Michael Ray Fuljenz, is head of operations at UCB and is a renowned expert and 30-time NLG (Numismatic Literary Guild) award winner in the field of numismatic studies.  Fuljenz has also served as a consultant to the U.S. Postal Service and the Federal Trade Commission and has been a columnist on rare coins and bullion for the Houston Post.  UCB has invested an exhaustive amount of time and resources into the development of a substantial clientele including a high end clientele group, all of which are confidential in nature and are of a great and unique value to UCB.  UCB is a Texas corporation headquartered at 7410 Phelan Boulevard, Beaumont, Texas77706-5749.

8.     Defendant Federal Express Corporation is the largest subsidiary of FedEx Corporation and does business as FedEx Express. FedEx Express is responsible for operating FedEx Corporation's express delivery services including FedEx First Overnight, FedEx Priority Overnight, FedEx Standard Overnight services, FedEx Same Day and domestic pick-up and delivery services. Federal Express is a Delaware corporation headquartered at 3610 Hacks Cross Road, Memphis, TN 38125.

9.     Defendant PRC, LLC (f/k/a Precision Response Corporation) at all times material herein was party to a contract with Federal Express under which PRC provided various call center services including those complained of herein. PRC is a Florida corporation whose principal place of business is located at 38151 Peters Road, Suite 4000, Plantation, Florida 33324.

10.      Defendant TPUSA's predecessor in interest, U.S. Solutions Group ("USSG")[1],  at all times material herein was party to contracts with Federal Express under which USSG provided various call center services including those complained of herein. TPUSA is a foreign corporation whose principal place of business is 1991 South, 4650 West, Salt Lake City, Utah 84104.

11.      Defendant Randstad: Spherion Staffing, LLC is the successor to Spherion Staffing, LLC who at all times material herein was party to a contract with Federal Express under which Spherion provided various call center services including those complained of herein. Spherion is a Florida corporation whose principal place of business is located at 5728 Major Boulevard, Suite 525, Orlando, FL 32819.

## SUBSTANTIVE ALLEGATIONS

12.      UCB utilized Federal Express' services for the shipment of coins to or from clients and to pick up checks from customers of UCB who have purchased coins from UCB and chosen to pay for the coins by personal check or money order.

13.      The use of Federal Express by Plaintiff was uniquely limited to their high value clients.

**Contractual Agreements With Federal Express**

14.      In furtherance of its business, UCB entered into standard Federal Express (FedEx) shipping contracts.

15.      As a result of their relationship with Federal Express, UCB also entered into contractual agreements including but not limited to the Federal Express Pricing Agreement, FedEx Service Guide and Website Modifications to the Agreements.

---

[1] USSG merged into Defendant TPUSA in January, 2014 and TPUSA is now the sole surviving corporation. (Agreed Order of Substitution, Doc. 87)

16.     The FedEx Pricing Agreement specifically recognizes mutual confidentiality between the client and FedEx.

17.     The FedEx Service Guide specifically recognizes the potential for improper illegal or other misuse of a FedEx account.  It also recognizes the need for the safekeeping of the account number, the account information and the protection from any misuse of the account.

18.     The FedEx contract recognized potential contact from persons claiming to represent the shipper.

19.      The contractual relationship between Federal Express and UCB foresaw the potential for improper, illegal or other misuses of the Federal Express account information and the importance of protecting the confidential nature of account information including account invoices.

**UCB Learns of the Release of Its Confidential Client Information**

20.     Beginning in late 2008, UCB was advised by several of its client customers that the customers were contacted by third party New York coin dealers.

21.     Unknown to UCB at the time, the common event among UCB's client customers (who were contacted by New York coin dealers) was that Federal Express had picked up a check or package from the customer at UCB's request and delivered the customer's check or package to UCB or UCB had shipped the package by Federal Express to the customer and as a result the customers contact and transaction information was revealed.

22.     UCB first learned that third party New York coin dealers had possession of UCB/FedEx account invoices when UCB's CEO, Mike Fulgenz met with Lara Gatz, Assistant U.S. Attorney for the Eastern District of New York and was informed that the government had seized the account invoices in the execution of a criminal warrant.

23.     Despite UCB's efforts including those directed toward Federal Express, March 17, 2010 was the first date that Plaintiff was able to discover the connection between its use of Federal Express' services, their relationship with specific shipments to clients and those clients being targeted for fraudulent activity by the New York coin dealers.

**The Failure of Federal Express' Own Security Controls**

24.     To the best of Plaintiffs knowledge, Defendants first improperly disclosed confidential information in the form of account invoices in 2006.

25.     On information and belief, Defendants undertook an investigation of the disclosure of account information in 2008 but did not advise Plaintiff of the disclosures prior to April 2010.  From 2005 to 2010 various New York coin dealers contacted Defendants to obtain copies of confidential information in the form of account invoices.

26.     The total number of disclosed account invoices and unique client contacts may never be determined due to Defendants' inadequate security measures and record keeping.

27.     A comparison of the Federal Express account invoices seized by the U.S. Attorney's Office and those voluntarily identified and provided by Federal Express shows that Federal Express' records understate both the number of confidential information releases and the amount of client confidential information that was disclosed.

28.     Defendants' employees failed to properly document the release of confidential information in the form of account invoices as evidenced by the absence of certain disclosures seized by the U.S. Attorney's Office when matched against Federal Express' internal records.

29.     Federal Express' records establish that they maintained invoice information requests including the account number, the account name, the date that a call or e-mail was received, who the alleged caller or e-mailer was, the invoice number and invoice date and the e-

mail address to which the information was forwarded.  None of the e-mail addresses which received information had any relationship to UCB's account with Federal Express.  Those same records establish that invoices were never e-mailed to any legitimate e-mail address associated with UCB.

30.     Federal Express' internal records have gaps of information and therefore understate the number of UCB customers whose contact information was disclosed by Defendants without UCB's authorization.

31.     UCB had a well-established practice of receiving its billing invoices weekly from Federal Express and only by U.S. Postal Service, never email  As such, a request to e-mail or fax a billing invoice should have alerted Defendants that this was an improper request for information and been denied.

32.     Based on the information available prior to formal discovery, Federal Express' internal records show at least four different e-mail addresses to which Defendants' improperly sent UCB's confidential information including atlantic1878@hotmail.com; collectibles44@gmail.com; morgan1901@gmail.com; and 1975@hr264.com. None of these addresses are consistent with contact information for Federal Express' contractual client UCB.

33.     Based upon information and belief, Defendants' employees either failed to validate UCB requests by asking a designated security question or they ignored incorrect answers to the security questions unique to UCB's account.

34.     The New York coin dealers' contacts with Defendants came in the form of both e-mails and telephone calls and from different persons working with different companies with different e-mail addresses and different phone numbers.

35.     Documents provided by Federal Express and the U.S. Attorney's Office confirm that on a regular basis, Defendants breached their duty of care to UCB and improperly disclosed confidential information including account invoices to New York coin dealers throughout 2006, 2007, 2008, 2009 and 2010.

36.     Unfortunately, although Federal Express purports to maintain a reliable record of all requests for and responses to request for account invoices, there were additional account invoice disclosures found in the U.S. Attorney's Office than identified by Federal Express.

37.     Unfortunately, it is far from certain that the disclosure by the U.S. Attorney's Office or the voluntary disclosure by Federal Express fully account for the account invoice disclosure by Defendants to the New York coin dealers.

38.     Based upon information and belief, it is anticipated that numerous account invoices were disclosed to the New York coin dealers that remain unidentified.

**New York Coin Dealers' Use of the Confidential Information Provided by Defendants**

39.     The New York coin dealers, over the 2006 to 2010 time period spoke with various employees of Defendant's, including but not limited to PRC employees Lauren Alberda, Audrey Berry, Tarod Brown, Erica Hyppolite, Lisa Reyna, Yvette Cruz, Wendy Gaff, Curtis Yap, Nicole Lazo, Denise Campbell, Richard Reynolds, Candace Pompey, Miguel Alfaro and William Davis, USSG employees Patti Jackson, Paul Chambers, Alicia Elam, Kim Dilliard, Jane Reisler, Jeffrey Renfro, Peggy Price, Denise Campbell, Heather Stillwell and Christina Dodd  and Spherion employees Machelle Nelson and Pamela Townsend who, against Federal Express policies and procedures and in the presumed absence of proper training and safeguards, routinely disclosed confidential information of UCB including account invoices to unauthorized third parties.

40.     PRC, TPUSA and Spherion each executed independent contracts with Federal Express which detailed their duties under the contract and the standard of performance relative to protecting the confidential information of Federal Express' customers.

**PRC's Duties to Protect Confidential Information**

41.     In its contract with Federal Express, PRC warranted that it would perform the call-in services for Federal Express in conformity with accepted standards of the call-in service center profession, and that it would comply with all applicable federal state, and local laws. PRC contracted that it would provide all training for its customer service representatives receiving calls, and that its training classes would ensure that its representatives complied with Federal Express' requirements. PRC promised to periodically monitor the quality of the customer service representative for call quality and accuracy, and to report those results to Federal Express.

42.     Importantly, PRC specifically "guaranteed" that Federal Express's confidential information would remain protected and secure. "Confidential Information" was specifically defined to include "customer information" in the Mutual Non-Disclosure Agreement between Federal Express and PRC. PRC acknowledged in that Agreement that any disclosure of confidential information "will be wrongful and will cause irreparable injury…," and agreed "to hold the other's Confidential Information in strictest confidence…"  Finally, PRC promised that it would not "communicate the…Confidential Information in any form to any third party without [Federal Express'] prior written consent."  PRC had a duty to protect Plaintiff's confidential information.

**Spherion's Duties to Protect Confidential Information**

43.     Spherion assumed similar duties.  In its contract with Federal Express, Spherion also warranted that it would perform the call-in services for Federal Express in conformity with accepted standards of the profession, and that it would comply with all applicable federal state, and local laws. Spherion contracted to maintain Federal Express' documentation in a manner in keeping with Federal Express policies, including compliance with Federal Express's security compliance requirements.

44.     Spherion promised to provide a full-time trainer for its employees solely dedicated to abiding by the Federal Express requirements, and agreed to periodically monitor the performance of its representatives.

45.     Spherion also agreed to "hold all information it obtain[ed] from…FedEx in the strictest confidence," and defined that confidential information to include "customer lists," and "data or information related to…FedEx's…customers."  Spherion specifically promised not to communicate this information in any form to any third party without Federal Express' prior written consent. Spherion agreed to comply with Federal Express' security rules and regulations. Spherion had a duty to protect Plaintiff's confidential information.

### USSG's Duties to Protect Confidential Information

46.     USSG also assumed broad duties in its contract with Federal Express, including the duty to "implement and maintain security controls and measures necessary to protect FedEx Sensitive Data from unauthorized access, …disclosure or use."  USSG specifically promised to protect "FedEx's…customer data."  USSG also warranted that it would perform the call-in services for Federal Express in conformity with accepted standards of the profession, and that it would comply with all applicable federal state, and local laws.

47.     USSG promised to provide a full-time trainer for its employees solely dedicated to abiding by the Federal Express Security Compliance Requirements, and agreed to periodically monitor the performance of its representatives.

48.     Like the other call-in centers, USSG specifically "guaranteed" that Federal Express's confidential information would remain protected and secure. "Confidential Information" was specifically defined to include "customer information" in the Mutual Non-Disclosure Agreement between Federal Express and USSG. USSG acknowledged in that Agreement that any disclosure of confidential information "will be wrongful and will cause irreparable injury…," and agreed "to hold the other's Confidential Information in strictest confidence…"  Finally, USSG promised that it would not "communicate the…Confidential Information in any form to any third party without [Federal Express'] prior written consent," and that it would "use its best efforts to prevent inadvertent disclosure" of confidential information. USSG had a duty to protect Plaintiff's confidential information.

49.     Notwithstanding these duties, PRC, Spherion and USSG improperly disclosed confidential information.  At the time that employees of Federal Express' vendors PRC, USSG and Spherion were improperly disclosing UCB's account invoices to unauthorized recipients, they were acting in the course and scope of PRC's, USSG's  and Spherion's obligations to Federal Express and/or as an agent or servant for and on behalf of Federal Express.

50.     The disclosure of confidential information in the form of account invoices provided the New York coin dealers with the information needed to contact UCB's customers and to disrupt UCB's business with those customers.

51.     The Federal Express account invoices provided confidential information that gave the New York coin dealers specific information to trade on to support their schemes, including

the nature of the delivery, whether the delivery was an envelope or a box, the weight of the shipped item, the date delivered, who signed for the package, the sender's and recipient's name and address including the UCB representative involved in the transaction.

52.     Armed with the disclosed confidential information in the form of account invoices, the New York coin dealers were able to gain the necessary trust that allowed their schemes to be successful and without such, would not have convinced UCB client customers to accept the offers and sales of coins which resulted in significant financial losses and their inability or unwillingness to conduct further business with UCB.

53.     UCB only sells coins graded by the two leading grading services, PCGS and NGC.  Non PCGS and NGC coins may be worth as little as five percent (5%) of their represented value in the schemes undertaken by certain New York coin companies.

54.     As confirmed by some of  UCB's client customers, it was the improperly disclosed information in the form of account invoices that enabled the New York coin dealers to execute their schemes by relying upon the customer's name, recent transactions, date package was sent, knowledge of the coins and sales person.

55.     Inevitably, the New York coin dealers, allowed by the access of confidential information from Defendants' disclosure of account invoices, would defraud the coin client through a number of different schemes including, but not limited to, using off brand grading services resulting in coins being worth pennies on the dollar.

56.     Based upon information and belief, individuals who either obtained confidential information in the form of account invoices from Defendants or who utilized them in their fraudulent schemes include but are not limited to Michael Amato, Joseph Romano and Michael Romano and include such companies as:

a.   National Sports Consulting, 56 Easton Ave., North Babylon, New York 11703

b.   PCA Rare Coins of New York whose business address is believed to be 1045 Rt. 109, Suite 104, North Lindenhurst, New York, 11757,

c.   Excell Marketing Group of New York, believed to be a corporation whose business address is 427-C West Main Street, Patchogue, New York, 11772,

d.   Empire Collectibles, a/k/a Empire Commodities of New York, believed to be a corporation whose business address if Port Jefferson Station, New York 11776.

e.   National Coin, Inc. of New York, believed to be a corporation whose business address is 3000 Hallock Ave., Suite A,  Port Jefferson Station, New York 11776.

f.   Premiere Coin Galleries of New York, believe to be a corporation whose business address is 20 Peach Tree Court, Suite 207, Holbrook, New York 11741 or 245 Sheridan Blvd., Inwood, New York 11696.

57.   The U.S. Attorney's Office determined that one of the tactics used by the New York coin dealers was targeting victims identified as "whales".  The ability to identify coin buyers who are involved in consistent transactions over a period of time, sometimes with very high insurable value rates played an integral part in the New York coin dealers' ability to target UCB's clients.

58.   The U.S. Attorney's Office ultimately indicted many of the individuals involved with the New York coin dealers for conspiracy to commit mail fraud, mail fraud, wire fraud and money laundering among other charges.

59.   Specifically, the complaint against the New York coin dealers stated that they were in the business of telemarketing coins and that the defendants falsely informed the customers that once they purchased coins that the defendants would assist the customer with the resale of the gold or silver coins or alternatively that a sales person would sell the purchased coins on the customers behalf at the coin show.

60.     The U.S. Attorney found that the New York coin dealers misrepresented the grade or condition of the coins and that the customers purchased coins worth approximately ten to twenty percent (10 – 20%) of the purchase price

61.     The U.S Attorney's office alleged that one group of these New York coin dealers defrauded coin buyers out of over sixty million dollars ($60,000,000.00) over a seven year period, while another group defrauded coin buyers out of seventy million dollars ($70,000,000.00).

62.     When indictments were brought in New York, the same individuals dismantled their New York coin operation(s) and moved to Florida where they continued to prey on UCB clients disclosed by Defendants in the account invoices.  Additional allegations of fraud netting over forty million dollars ($40,000,000.00) were made in Florida.

**UCB is Damaged by the Release of its Confidential Client Information**

63.     As a result of Defendants' sole negligence, disclosure of confidential information, including account invoices to New York coin dealers occurred for over 5 years.

64.     These New York coin dealers, armed with information derived from improperly disclosed account invoices, were able to contact and defraud UCB's client customers through a variety of information/confidence based schemes.

65.     As a result of these contacts and fraudulent transactions former UCB client customers were unable to or refused to conduct subsequent business with UCB.

66.     In its investigation of these matters, Plaintiffs have identified specific UCB client customers whose identities were released to the New York coin companies by Defendants' improper disclosure of confidential information in the form of account invoices.

67.     UCB has identified a minimum of 621 unique coin clients whose confidential

information was disclosed to the New York coin dealers as a result of Defendants' failure to

protect the confidential nature of these transactions.  An analysis of those 621 clients shows a

staggering reduction in the number of sales transactions with UCB after their disclosure by

Defendants with a resulting loss of millions of dollars of sales to UCB. Plaintiff has been

particularly harmed because the nature of these disclosures occurred at a time when the U.S.

economy was suffering and gold prices were rising as investors fled traditional markets and

invested in coins.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

68.     Plaintiff repeats and realleges each and every allegation continued in the

foregoing paragraphs as if fully set forth herein.

69.     In late 2008, UCB was advised by several of its client customers that the

customers had been contacted by third party coin dealers.

70.     As of late 2009, Mike Fulgenz, CEO of UCB was under the erroneous impression

that competing coin companies must have been hacking Defendant's computer system to access

his customer's account information and he communicated his impressions and concerns in this

regard to Di Ann McCoy, Defendants' Senior Account Executive for Southeast Texas and

Louisiana.

71.     Federal Express and Spherion by and through Federal Express employees Di Ann

McCoy, Joseph Grunow, Lisa Akers, and William Brown and Spherion employee Desiree Wolff

had knowledge, at least since November 27, 2009, that Federal Express' own employees or

employees of their contractors PRC, USSG and Spherion had been disclosing UCB account

invoices to unauthorized third party coin dealers since 2006.

72.     Federal Express intentionally concealed the improper disclosures described in the forgoing paragraphs to forestall legal action.

73.     UCB first learned that unauthorized persons had received UCB account invoices when Mike Fulgenz met with Lara Gatz, Assistant U. S. Attorney for the Eastern District of New York on March 17, 2010 and was informed that the government had seized UCB account invoices in the execution of a criminal search warrant.

74.     Federal Express waited until April 2010 to admit their employees had disclosed UCB's account invoices.

75.     UCB had no ready access to information which would have alerted them to the fact that Federal Express' own employees or employees of PRC, USSG and Spherion were responsible for improperly disclosing their invoices to unauthorized individuals.

76.     By its very nature, the unlawful activity, as alleged herein, that Defendant Federal Express engaged in was self-concealing.

77.     As a result, Plaintiff had no knowledge of the unlawful disclosures and could not have discovered same by the exercise of due diligence on or before March 17, 2010.

78.     As a result of the concealment of Defendant Federal Express' unlawful conduct, and the self-concealing nature of Defendant Federal Express' acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.  Defendant Federal Express fraudulently concealed the facts giving rise to Plaintiff's cause of action.

79.     All Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## TENNESSEE CODE SECTION 20-1-119

80.     Plaintiff further pleads the application of Section 20-1-119 of the Tennessee Code, permitting Plaintiff to amend its complaint to assert a claim directly against the defendant tortfeasors PRC, USSG and Spherion named by Defendant Federal Express.

81.     Defendant Federal Express placed comparative negligence and respondeat superior into issue, and alleged in an answer that persons not party to the suit (namely, PRC, USSG and Spherion) caused or contributed to the damage for which the plaintiff seeks recovery.

## THE DISCOVERY RULE

82.     Plaintiff did not discover, nor should Plaintiff have, reasonably discovered Federal Express's wrongful conduct causing its injury until March 17, 2010, the date that A.U.S.A. Gatz informed UCB of Federal Express's involvement.

83.     Plaintiff did not discover, nor should Plaintiff reasonably have discovered, (1) the injury and (2) the identity of the persons whose wrongful conduct caused the injury, until Federal Express disclosed in discovery and in its pleadings that PRC, USSG, and Spherion contributed to Plaintiff's harm.

84.     The discovery rule applies to toll the statute of limitations as to all causes of action against Federal Express, PRC, USSG, and Spherion.

## RESPONDEAT SUPERIOR

85.     At all relevant times, the persons causing Plaintiff's injuries were the agents of Defendants Federal Express, PRC, USSG, and Spherion.  Those persons were acting within the scope of their employments when the injury occurred. Further, those persons were acting in furtherance of the employer's business and for the accomplishment of the purpose for which the employees were hired.

86.     Defendants Federal Express, PRC, USSG (now TPUSA), and Spherion are liable to Plaintiff under the theory of respondeat superior.

**CLAIMS FOR RELIEF**

**COUNT I**
**Gross Negligence**

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     Defendants had a duty to exercise due care in the management of Plaintiff's confidential information.

89.     Defendants grossly failed to exercise due care and acted in disregard of their duties and thereby injured Plaintiffs.

90.     Defendants' blatant failure to follow their own established security protocols amounted to Defendants essentially handing over Plaintiff's proprietary high worth client list to unauthorized individuals.

91.     Defendants failed to exercise the good business practices that are reasonably expected when they grossly failed to: a) take adequate steps to verify and/or authenticate the identities and authority of the individuals requesting UCB invoices and billing information; b) take reasonable steps to insure the security of UCB invoices and billing information; and c) follow their own security procedures before negligently and repeatedly releasing UCB's confidential information to third parties.

92.     Defendants failed to properly train and supervise employees acting on behalf of Federal Express in safeguarding UCB's confidential business information including account invoices.

93.     As a direct and proximate result of Defendants' gross negligence Plaintiffs have incurred damages.

## COUNT II
### Negligence

94.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

95.     By virtue of the foregoing, Defendants breached their duty to exercise reasonable care, competence and diligence in the management and oversight of Plaintiff's confidential information and to act in a manner consistent with industry customs, practice and standards.

96.     As a direct and proximate result of the negligence of Defendants, Plaintiff suffered damages.

## COUNT III
### Breach of Contract

97.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against Federal Express for breach of contract .

98.     UCB and Federal Express were signatories to contractual agreements including the FedEx Pricing Agreement, the FedEx Service Guide, and Web Site Modifications to the Agreements.

99.     The agreements identified above, contain numerous references to the importance of confidentiality and privacy of information involving UCB's accounts.

100.    The FedEx Pricing Agreement specifically recognizes mutual confidentiality between UCB and Federal Express.

101.     The FedEx Service Guide specifically recognizes the potential for improper, illegal or other misuse of a FedEx account and recognizes the need for protecting the account number and the account information to prevent any misuse of the account.  The FedEx shipping contract further recognizes potential contact from persons pretending to represent the shipper.

102.     As set forth in detail above however, Federal Express and its contractors failed to safeguard UCB's account information and improperly disclosed account invoices to unauthorized third parties and in so doing breached its agreements with UCB to keep such account information confidential and not to disclose it to any other person without UCB's consent.

103.     As a proximate result of Federal Express' breaches of contract, Plaintiff has sustained damages in an amount yet to be determined and to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Compensatory and punitive damages in an amount to be proven at trial;

B.     Costs and attorneys' fees incurred in prosecuting this action; and

C.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(a), Plaintiffs hereby demand a trial by jury of all issues so triable.


Respectfully submitted,

By: /s/Michael Hamilton_____
Michael Hamilton, TN Bar No. 10720
PROVOST UMPHREY LAW FIRM LLP
2021 Richard Jones Road, Suite 300
Nashville, TN37215
(615) 242-0199

(615) 256-5922
mhamilton@pulf.com

Bryan O. Blevins
PROVOST UMPHREY LAW FIRM LLP
490 Park Street
Beaumont, TX77701
bblevins@pulf.com


**CERTIFICATE OF SERVICE**

I hereby certify a true and foregoing copy of the Second Amended Complaint has been

sent to all counsel of record via the Court's CM/ECF filing system on this 9th day of June, 2014.


/s/ Michael Hamilton
Michael Hamilton